20-3971. Good morning, Your Honor. Good afternoon, Your Honor. May it please the court. Cases like Mr. Rivers will define what kind of a society we are, what kind of a people we are. This just isn't about compassion for a fellow human being. This is a case about our humanity as a nation, as a society. Should a pretrial detainee face death, a man presumed to be innocent? And I hope and pray that the answer is a resounding no. My client has been incarcerated as a pretrial detainee for some two and a half years. There have been 620,000 inmates and correctional offices across the country who have developed COVID, and 2,800 of them, inmates and correctional offices, have died. The MDC reported 349 inmates with the disease and 59 staff members, for a total of 408 who have recovered from COVID. As of yesterday, my checking was that the MDC was reporting 19 inmates currently have active COVID and 18 staff members. I submit to Your Honor that MDC, as well as the rest of the Bureau of Prisons, sorely undercounts the numbers of people in the prisons who have COVID. I direct your attention, perhaps you saw it yesterday, it was on the front page of the New York Times, there was an investigative report about Danbury, Connecticut, and other federal facilities, reinforcing what Dr. Vettner said in my submission and appendix, that they, VLP is not testing, they're not providing safety, they are not providing the kind of medical, quick medical support that they need, they don't have the ability to quarantine high-risk individuals like my client, and they're clear. I don't think anyone on this panel could argue that Mr. Rivers is not a high risk. He is 61 years old, he'll be 62, he suffered a heart attack in 2005, he has had a cardiac arrest and a cardiac involvement while he's been incarcerated, he was hospitalized from December 5th to the 12th, he had a subsequent cardiac arrhythmia. It is confirmed without dispute that he has a blocked, throtted artery. He suffered from coronary heart disease, he suffered from cardiac arrhythmia, and he's had a prior replacement. One of these would be a comorbidity that, and many have been released in the circuit and the district with one comorbidity. He has five of the highest on the CDC reporting as to high risk of not only death should he get COVID, but he could be permanently and seriously disabled for the remainder of his life. Excuse me, you have a minute left. Yes, okay. I'm going to save a minute for rebuttal. Or is that, do I still have a minute for this? Fine, that's fine, you can reserve that minute. Okay, so I just want to say, Your Honor, that he is not a danger of flight, that there are 99% of the pretrial detainees who are put on GPS have not committed another crime or have absconded, and I have that in my papers, Your Honor. And he certainly is not, at the present time, do I believe that there is, by a preponderance of the evidence, that he is dangerous. He is going to his daughter's home, he will have GPS, he will not be leaving. He risks his own life if he leaves because of his high risk, but he would also risk being returned to the MDC, something that would not be clearly in his best interest. He's drug-free, and I do believe, Your Honor, that there has been clear error, and I ask, Your Honor, to reverse Judge Clinton. All right, Judge Raji, any questions? Yes, just a few. My understanding is that they have started to vaccinate prisoners, indeed maybe well along on that process, in the New York federal facilities. What's the status with respect to your client's vaccination? I don't know the answer to that, Your Honor. I don't know. You haven't discussed that with him? Well, the last time I talked to him, he had not been vaccinated. And how long ago was that? That was a week ago. Okay. And where would your client be residing? He would be residing with his daughter, I believe it's in the Bronx, Your Honor. Well, it's that some folks who have sought compassionate release would actually be going into communities and neighborhoods that have a higher infection rate than the federal facilities, and so I was wondering how the area where your client proposes to go back would be. I mean, the Bronx has been the area of the city that has had the highest infection rates, or at least among the highest. I don't know what section, Your Honor. I'm sorry, I can't answer that for you. But let's assume that the neighborhoods where people of color are residing have been denominated as high-risk areas, correct? He would be with her, and I think she has two children. All right. I understand we just don't have record information on that, but thank you very much. I don't have any further questions. Judge Cabranes, thank you. Judge Sullivan? I guess just very briefly, Ms. Carty. I mean, obviously, Judge Kuntz made much of the prior criminal history, multiple felonies and failures to appear. I mean, there's a long history here that would suggest risk of flight and danger. You've said several times that your client's neither of those, and I guess what is the response to his criminal history? He's just no longer— I think it was eight years ago, Your Honor. I think that if you look at his criminal history, it is reminiscent of many people I've represented years ago in state court who were addicted to gambling. He has one issue while he's been incarcerated, and that was very early on. He wouldn't go into his cell. Look, he's old, he's sick, and he's drug-free, and I do think that having a GPS really will answer the concerns of risk of flight as well as dangerousness, because he can't reach, and we'll know if he leaves, and he will go right back to prison. So, we can't allow, I don't think, Your Honor, for this pretrial detainee to risk death or serious, serious, serious health issues long-term under these extraordinary circumstances. Okay. I have no further questions. Thank you. Ms. Carty, this is Jessica Berenice. What exactly did Judge Kuntz not consider, in your view, during the proceedings before him? I think he did not consider—even though he said he considered that his medical conditions were compelling—I don't think he did consider them as compelling. I don't think he gave the proper weight to the really serious comorbidities that my client suffered from. As you may recall, Judge Kuntz denied this bail application when the previous lawyer made it, and it was because he didn't have medical evidence, and then when we supplied him with what I consider to be substantial medical documentation of these comorbidities, he ignored them or didn't find them compelling. I think not finding them compelling is clear error. I think in regard to the risk of flight, I think that, you know, a GPS, he did not weigh—in my view, what we're doing here, because of COVID, is we're weighing a number of factors, and the as being weighted, how compelling is the medical issues, and what are the risks? In this particular case, if you can answer those risks, and I think you can, very much so—I mean, I didn't hear from the government, but, you know, I think you can—the compelling medical reasons weigh overweigh the situation, because if this man gets COVID, it is very likely he will die. That's not what we want pretrial detainees to be suffering, and they have—he's two and a half years, and his trial has been in until July. I just don't think we can risk that happening for this gentleman under the circumstances, and that's what I think Judge Kuntz didn't really admit how compelling it truly is. Thank you very much. You've reserved one minute, and we'll hear then from the government. Good afternoon, Your Honors, and may it please the Court. My name is Jonathan Algor, and I'm Assistant United States Attorney in the Eastern District of New York. I represent the United States here in this appeal and do so as well below in the District Court. The District Court's detention order should be affirmed. As Your Honors have heard, defense counsel has not pointed to any error that Judge Kuntz has made, and there's clearly not clear error here. This court would have to be left with definite and firm conviction that a mistake has been committed, and the record falls far short of meeting that high hurdle here. In just briefly going through, and I outline this more in our clear error when considering all the four factors in the Bail Reform Act. When looking at the nature and circumstances of this offense, an armed bank robbery, as Judge Kuntz said, that weighs heavily in favor of detention. Defense makes mention of a purported fake gun that was used, but when you look at the statute, 18 U.S.C. 2113d, that talks about armed bank robbery, and it doesn't necessarily require a real gun to do so, and the government can't say whether or not that gun is real. It sure looks like it's real on the surveillance video, and when the victim and the teller are standing there as Mr. Rivers' co-defendant is pointing the gun at their head. When you also talk about the weight of the evidence against the defendant here, it's overwhelming. We have cell site data, surveillance of the robbery, DNA tied to both of the defendant's co-defendants, the three of the defendants on a three-way call, and as well, the defendant admitting post-Miranda of his participation in this armed bank robbery. You also, and Judge Sullivan referenced this, when you look at the defendant's history and characteristics, the criminal record of this defendant is extremely long. You have 36 arrests, multiple felony convictions, as well as a history of failing to appear, and defense counsel says that the most recent arrest was in 2013, but that's only four years prior to the defendant's arrest for an armed bank robbery here. It is a pattern in history of failure to comply with the law and court orders and requirements that shows the defendant's risk of flight. When Judge Koontz looked at all of these factors, the judge made a determination that in the balance of all of those, the defendant was a dangerous community based on the offense here, as well as a risk of flight based on the defendant's history and the totality of the defendant's actions. Again, Your Honors, I don't believe that the I know Judge Radge raised the question about vaccination. I received an email this morning from MDC Legal. The defendant has not been, it was offered and accepted and is on the list, but has not been provided the vaccine yet, and there is no estimated date yet, but the vaccines have started for MDC inmates, and the defendant is on that next list to receive it. Barring any other questions, Your Honors, I have nothing further. Judge Radge, any questions for the- No, thank you. I have no further questions, no questions either. I have just a simple question about the record. How long has he been there now? Yes, Your Honor. He was arrested in August of 2018. Now, he's on his third attorney. His first attorney, he had a scheduled change of plea on April 2019, and that was appointed new counsel. Then we've had extensions of trial dates based on both defendants with new counsel, and then one of the co-defendants, James McLeod, asking for extensions as well. Currently, the trial date is scheduled for July 26, 2021, this year. That's a very long time to be in pretrial detention. Is there anything that's within your powers that you think can be helpful in these circumstances to avoid any suggestion of indifference to his medical needs? Yes, Your Honor. Our office, along with federal defenders and the CJA panel, has highlighted cases for . . . and there's a judicial panel right now in the EDNY that is collecting all of the in-custody defendants and has . . . is collecting the list from all the parties regarding who has been in custody the longest so that they will get priority as they roll out trials here in EDNY. That is being evaluated by Judge Chen. She's heading that panel, and this case is clearly on that list regarding needing one of the earliest trial dates. All right. Have you had discussions with Ms. Carty about any measures that can be taken to ameliorate the situation or to bring into trial faster than now scheduled? Your Honor, I don't . . . we can raise that with Judge Coons. I don't know how much control we have of that based on what . . . we're still awaiting the panel's determination on what trials go when. I don't want to go into any details about possible plea discussions, but have you at least exhausted those possibilities? No, Your Honor. You have not exhausted the possibilities. Can you perhaps give some consideration to that and we . . . without getting into any details, we've had discussions with both counsel about . . . Oh, you have? That's my question. All right. That's fine. All right. Thank you very much. We'll hear from Ms. Carty, who's reserved one minute. Your Honor, I just want you to know that the trial date was selected to respond date by Judge Coons and not by . . . certainly by any request on my behalf. Your Honor, just to point out a few things. Judge Coons didn't hold a hearing to support his findings on the risk of flight. He called for medical documentation and then he ignored it. Frankly, I think the relevancy and respectfully of whether there's a higher infection rate in the community versus the prison is . . . the issues are very different because in the prison, like the schools and like the nursing homes, we have massive numbers of people, people coming in and out every day from communities, the correctional offices, the new prison inmates who are coming in, the inability to quarantine people properly. Here, he will be just in an apartment in a home with his daughter. He will not be going out. He . . . it is so much less risky for him to be in that environment. I think, Judge Cabranas, you're absolutely right. It's going to be three years before this man is tried. Do we want him to . . . is it sufficient for the government to say, oh, well, we're having everybody look at it and we're going to do our studies and we're going to count our numbers? If you looked at the New York Times article yesterday, the BOP has been doing that for about a year now and really nothing has been accomplished. We can have our committees and we can talk about our numbers and maybe Mr. Rivers' case will pop up for an earlier trial, but that's not the point. The point is, he needs to be out of prison and safe so that even when he goes to trial, I will have had ample opportunity to talk with him because, by the way, it's near impossible to prepare our clients for any kind of trial or hearing when you get, if you're lucky, 30 minutes at a time and if you get, if you're lucky, a time that both of you are So, it is, it's a complicated situation, but I think this, I didn't bring every case that I was denied to this court. I brought this case because this case, I believe, cried out for a different response. So, I'm asking, Your Honor, to give my client that different response and to say, his life is that important that we will take that risk. We will put him in a GPS, we will put him in his daughter's apartment, we will take that risk because that is what we should do for an individual with these kinds of medical conditions. Where exactly is his daughter's apartment? I think it's in the Bronx, Your Honor. I'm looking for my papers. That's okay. But I believe, I believe it's either upper Manhattan or the Bronx. Okay. Well, thank you, Ms. Cardi and Mr. Algor very much. We'll reserve the decision and thank you for your arguments.